UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LILLIAN J. TOCCO,

                Plaintiff,                          Civil Action No. 05-73963

v.                                           Judge Avern Cohn

ARGENT MORTGAGE CO., LLC,
AMC MORTGAGE SERVICES ,
f/k/a AMERIQUEST MORTGAGE CO.,
ACCESS MORTGAGE AND FINANCIAL,
RYAN PHILLIPS,
DEUTSCHE BANK NATIONAL TRUST CO.,
H. JAMES WHITE,
jointly and severally,

                Defendants.

_____/

## MEMORANDUM AND ORDER (1) GRANTING ACCESS MORTGAGE AND FINANCIAL'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS ARGENT MORTGAGE CO. LLC, AMC MORTGAGE SERVICES, RYAN PHILLIPS, AND DEUTSCHE BANK NATIONAL TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT; (3) GRANTING H. JAMES WHITE'S MOTION FOR SUMMARY JUDGMENT; (4) DENYING TOCCO'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (5) GRANTING DEUTSCHE BANK NATIONAL TRUST COMPANY'S MOTION FOR APPROVAL TO COMMENCE FORECLOSURE

### I. INTRODUCTION

This is a property case.  Plaintiff Lillian Tocco (Tocco) claimed in her first

amended complaint that defendants (1) Argent Mortgage Company (Argent), (2) AMC

Mortgage Services (AMC) f/k/a Ameriquest Mortgage Co. (Ameriquest), (3) Access

Mortgage and Financial (Access), Mike Olsen (Olsen), Ryan Phillips (Phillips), H. James

White (White), and Deutsche Bank National Trust Company (Deutsche), violated state

1

and federal law in refinancing an existing mortgage and foreclosing on a new mortgage

on Tocco's home on August 29, 2003 (the mortgage).  Tocco says that the loan

documents she signed did not comport with assurances made to her and her husband

Salvatore[1] by the defendants, and that the foreclosure by advertisement was illegal.

Tocco requests (a) invalidation of the foreclosure by advertisement;

(b) declaratory judgment declaring her the right to rescind her loan contract with Argent;

(c) actual damages; (d) restitution; (e) disgorgement of profits; (f) injunctive relief; and

(g) punitive damages.

The defendants can be characterized as follows:

• White is an attorney. He was retained by the Toccos for matters relating to the refinancing of the Tocco's mortgage in 2003.

• Access is a mortgage broker.

• Olsen was an Access employee or agent.  He was dismissed from the case on his paying $7,500 to Tocco.

• Argent is the initial lender.

• AMC is a mortgage servicer.  It  purchased the servicing rights to the mortgage from Argent.

• Deutsche was assigned the mortgage from Argent, and is the current mortgagee.

• Ameriquest is a mortgage broker.  It appears to be the sister company of AMC. [2]

---

[1] Salvatore Tocco passed away on October 27, 2003.

[2] The relationship between AMC and Ameriquest is unclear.  While Tocco asserts that AMC was formerly Ameriquest,  AMC asserts Ameriquest is a separate company from AMC.  AMC explains that it provides "customer leads" to Ameriquest. However, AMC has not formally called attention to whether it has been wrongly named

• Phillips is an Ameriquest or AMC employee.

In her first amended complaint, Tocco made the following claims:

Count 1:    a violation of the foreclosure notice statute, M.C.L. § 600.3216, against Argent and Deutsche;

Count 2:    a violation of the Michigan Consumer Protection Act, M.C.L. § 445.901, et seq. (MCPA), against Argent, AMC, and Deutsche for conducting a foreclosure sale by advertisement;

Count 3:    a violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. (FDCPA), against AMC and Deutsche for conduct relating to the foreclosure notice;

Count 4:    a violation of the FDCPA against AMC for conduct relating to the collection notices;

Count 5:    a violation of the Michigan Mortgage Brokers Act, M.C.L. § 445.1651, et seq., (MMBA) against Access, AMC, Olsen[3], and Phillips;

Count 6:    fraud and misrepresentation by Access, AMC, Olsen, and Phillips;

Count 7:    a violation of the Truth in Lending Act (TILA), 15 U.S.C. § 1635(f), and Regulation Z, 12 C.F.R. 226.19, against AMC, Phillips, Access, Olsen, and Argent;

Count 8:    unjust enrichment against Access, Argent, AMC, Olsen;

Count 9:    a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq., against Argent, AMC, Access, Olsen, Phillips, White, and Deutsche;

Count 10:   legal malpractice against H. James White;

Count 11:   violation of the MCPA against Argent, AMC, Access, Olsen, Phillips, White and Deutsche for their cumulative actions.

Before the Court are (1) Access' motion for summary judgment; (2) Argent, AMC,

_____

in this action as Philips' employer.  The same attorneys are representing AMC and Phillips.

[3] Olsen was dismissed from the case on December 5, 2005.

3

Phillips, and Deutsche's joint motion for summary judgment; (3) White's motion for

summary judgment; (4) Tocco's motion for leave to file second amended complaint; (5)

Deutsche's motion for approval to commence foreclosure.

For the following reasons:

(1)  Access' motion for summary judgment is GRANTED and it is DISMISSED from the

case;

(2) Argent, AMC, Phillips, and Deutsche's joint motion is DENIED in part and GRANTED

in part and Argent and Deutsche are DISMISSED from the case;

(3) White's motion for summary judgment is GRANTED and he is DISMISSED from the

case;

(4) Tocco's motion for leave to file second amended complaint is DENIED; and

(5) Deutsche is DIMSSED from the case and Deutche may commence foreclosure.

## II. BACKGROUND [4]

### A. Tocco's Version of the Events

### 1. The Toccos' Search for a Lender to Refinance their Home

In June, 2000, Tocco and her husband Salvatore (the Toccos) gave David

Nickola, an attorney, a lien of $ 50,000.00 on their home.  The lien secured payment of

---

[4]  The background is gleaned from the parties' papers.  The parties followed the Court's summary judgment motion practice guidelines but for the following exception: the Plaintiff did not highlight the relevant portions of exhibits.  For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/Cohn/motion/htm.

fees for Nickola's representation of the Toccos' son in an unrelated criminal matter.  In

2003, Nickola demanded payment, and when the Toccos could not pay him, he

threatened to enforce the lien.  To prevent foreclosure the Tocco's sought to refinance

their home.  The Toccos had difficulty due to a previous bankruptcy filing.

Tocco contacted Access and spoke to Olsen about refinancing her home.  Tocco

also asked Olsen for the name of an attorney and Olsen named White.  Tocco

subsequently retained White to resolve the dispute with Nickola and to represent them

in the refinancing of the home.  Olsen prepared and submitted an application to Citizens

Bank for a mortgage, but prior to the final approval and closing of the mortgage, Tocco

was solicited by Phillips of Ameriquest/AMC and offered brokerage services.[5]  Tocco

says that her relationship with Olsen stopped after she was contacted by Phillips.

Phillips informed her and Salvatore that Argent was processing their loan application

and that their payments would exceed $4,000 per month.  Tocco and Salvatore told

Phillips that they could not afford the new monthly payments.  Phillips said an additional

$50,000.00 would be borrowed to cover the first 12 months of payments, and promised

she would be able to refinance the mortgage at a lower rate at the end of a year. Phillips

also promised that the mortgage would not carry a pre-payment penalty and would be at

a fixed rate of interest.

_____

[5] Tocco believes that Phillips contacted her in 2003 because she had an existing
loan with AMC.  There is no evidence of an existing loan with AMC in 2003.  Instead the
record reflects that the Toccos had (1) a mortgage with Citizens Mortgage Corporation
in the amount of $ 330,000.00; (2) a mortgage with World Wide Financial Services, Inc.
for $48,438.00; and (3) a lien with Nickola in the amount of $50,000.00.  These
obligations were paid off through the 2003 refinancing of the home with Argent.

Argent required an appraisal of the home, which was completed by Robert Mooney (Mooney). Mooney was chosen by Ameriquest/AMC. Mooney appraised the house at $800,000.00. Additionally, the Tocco's submitted two hand-written letters to Argent on August, 15, 2003. The first letter concerned their monthly gross income, which they estimated at $14,666.00. The second letter explains their poor credit history as attributable to recent legal expenses concerning their son which resulted in the the lien to Nickola.

## 2. The Closing Meeting of August 29, 2003

The closing occurred on August 29, 2003. The Toccos, a representative of a title company, and White attended the closing.[6] Tocco and Salvatore were surprised for many reasons at the closing. First, the loan documents did not match the promises Phillips had made to them. Specifically, the mortgage included an adjustable interest rate instead of a fixed interest rate and included a prepayment penalty instead of having no prepayment penalty.

Second, Tocco and Salvatore saw a "Good Faith Estimate" outlining the terms of the new mortgage for the first time. While the Tocco's signatures are dated August 28, 2003 (the day before the closing), Tocco and Salvatore signed the document at the closing, but mistakenly misdated it. Third, a document stated that a $15,000.00 "loan origination fee" would be paid to Access. Tocco and Salvatore were surprised to see this fee because they thought that they had refinanced with Ameriquest/AMC through Phillips.

---

[6] It is unclear which title company handled the closing. Tocco does not allege that Phillips was present at the closing.

6

The details and terms of the mortgage documents were confusing to Tocco and Salvatore, and, therefore, they relied on representations made by the various defendants.  Tocco and Salvatore questioned why the loan terms were not the same as Phillips had promised, but signed the documents anyway because they remembered, trusted and depended on Phillips' assurances that they would be able to refinance in a year.  Tocco also depended on White's assurances at the meeting, and the title company representative's statement that failure to sign would result in complete loss of the new mortgage.

The documents the Toccos signed included  an "Adjustable Rate Rider", a "Truth in Lending Disclosure Statement", the "Borrower's Acknowledgment of Final Loan Terms", and an "Important Notice to Borrowers".  After payment of their their prior obligations through the refinancing (see footnote 4), the Toccos came away with approximately $50,000.00 in cash.

### 3. Tocco's Attempt to Refinance the 2003 Mortgage

Before the first payment was due, Argent notified the Toccos that AMC would be processing the payments.  The Toccos obtained 12 money orders in the amount of $4,149.67 each, made payable to AMC using the approximately $50,000.00.  Tocco made the 12 payments believing that the new mortgage would be refinanced, giving her affordable monthly payments in the future.

Tocco attempted to refinance in 2004.  She initially contacted Olsen at Access, but was contacted by Phillips of AMC again.  Phillips requested a second appraisal

which was performed Mooney, who again valued the house at $800,000.00[7] For some reason, Phillips request a third appraisal, this time by a different appraiser.  This time the home was valued at only $500,000.00.  AMC declined to provide refinancing and stated in a January 31, 2005, letter that this was due to the appraisal value.  Unable to refinance the new mortgage or afford the monthly payments, Tocco made no additional payments after September, 2004.

Argent assigned the mortgage to Deutsche in April, 2005.  In July, 2005, Deutsche commenced foreclosure by advertisement. The advertisement announced that a forfeiture sale would occur "at public venue, main lobby of the Courthouse in Flint, MI, at 11:00 A.M. on Wednesday, September 7, 2005."  Tocco tried unsuccessfully to sell the home to payoff the new mortgage.  Tocco also retained a new lawyer to resolve her problems without litigation.

On September 7, 2005, Tocco filed for bankruptcy.  On September 13, 2005, Tocco filed suit for an injunction in the Genesee County Circuit Court to stop the foreclosure.  Deutsche dismissed the foreclosure action before the court could consider the request for an injunction.  Tocco then filed this case in Genesee County Circuit Court.  The defendants removed the case to this Court in October, 2005.

As the case proceeded, Olsen settled with Tocco.  He entered into a Release of Claims With Hold Harmless Provision (Release) on November 23, 2005, for $ 7,500.00. Olsen was dismissed from the case on December 5, 2005.

### B.  The Defendants' Version of the Facts

---

[7] There is no evidence on record of this second appraisal.

8

Olsen testified at his deposition that White, Tocco's lawyer, referred the Toccos to him. Olsen had no personal relationship with White. However, White had worked with other loan officers at Access before the Tocco referral. Olsen's role in the 2003 refinancing was limited to taking the Tocco's application and sending it to various lenders. Olsen alone submitted the Tocco's application to Argent and he did not promise the Toccos that they could refinance with no prepayment penalty, a fixed interest rate, and refinance in one year. When Argent approved the Tocco's application, he received part of the origination fee. The Toccos called him again in 2004 to attempt to refinance the mortgage. Olsen sent out a couple of faxes to various lenders, including one to Ameriquest and one to Argent to find out about a loan payoff. Before Olsen was finished, Tocco called and told him the refinancing was taken care of. Olsen stopped all work for the Toccos. Olsen did not know or work with Phillips of Ameriquest/AMC at any point during the 2003 refinancing or in 2004 when the Toccos attempted to refinance. Olsen did not explain why he settled with Tocco; he states that the settlement money came from his personal savings.

When Tocco attempted to refinance the 2003 mortgage, AMC received a call from a mortgage company inquiring into the payoff amount of the mortgage. Upon receiving this request, AMC contacted Ameriquest and told it that Tocco may be interested in refinancing the loan. Phillips was the Ameriquest employee who received this request. Phillips does not recall the exact date that he first contacted Tocco, but he says that it was after the 2003 mortgage had closed because he called Tocco to discuss refinancing the mortgage. Phillips never spoke to Salvatore, who was already dead when he began working with Tocco. Phillips never promised Tocco a mortgage with a

9

fixed interest rate and no prepayment penalty, or promised her that she would be able

to refinance after one.  Philips could not have made such promises because it was the

underwriting team, not a loan officer, that made the final decision whether or not a loan

would be approved.  Furthermore, Ameriquest prohibits an agent from refinancing with

the same customer more than once, although an existing customer could refinance with

the company through a different agent.  Phillips also says that he never worked with or

knew Olsen outside of this litigation.  It was against Ameriquest's policies for its

employees to work with outside mortgage brokers.

       The Toccos contacted White to resolve their dispute with Nickola concerning the

$50,000.00 lien.  White's duties were limited to trying to convince Nickola to delay

foreclosure while the Toccos attempted to refinance the home to get money to pay off

his lien.  White's only involvement in the refinancing was to provide the Toccos with a

list of brokerage agents, which included Access' and Olsen's names.  White did not

know Olsen personally.   White had no knowledge of which company actually refinanced

the Toccos' mortgage.

       White showed up at the closing on August 29, 2003, to get paid.[8]  The Toccos

were surprised to see him there because they had not requested his presence at the

meeting.[9]  The Tocco's talked to him only briefly.  Tocco told him that she and Salvatore

were "going with Mike Olsen."  The Toccos did not appear to have questions or

concerns about the mortgage documents.  Tocco only asked him about the payment of

---

[8]  White received $5,000.00 out of the mortgage proceeds.

[9]  White does not say how he learned of the closing.

10

the summer property taxes, to which he responded that they did not have to sign the documents, and even if they did, they had three days to get out of the agreement. The Toccos did not appear to listen to what he said and signed all the documents without further question or comment.

### III. DISCUSSION

### A. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in

11

summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

### B.  Access' Motion for Summary Judgment.

#### 1.  Introduction

Access makes two arguments in support of its motion for summary judgment. First, Access says Tocco's agreement with Olsen, its agent, releasing him from any claims also releases Access from any liability.  Second, Access says there is no genuine issue of material fact against it as to counts 5-9, warranting summary judgment in its favor.  Each count will be addressed in turn.

#### 2.  Olsen's  Release

##### a.  Argument

Under the Release, Tocco released Olsen from any liability in return for

12

$7,500.00.  Access says, under the common law rule, the valid release of an agent for tortious conduct bars recovery against the principal sued on a theory of vicarious liability.  Theophelis v. Lansing Gen. Hosp., 430 Mich. 473, 480 (1988)(releasing a nurse and supervising anesthesiologist from liability in a wrongful death action had the legal effect of releasing the hospital from vicarious liability).  Access says there is no question that it was Olsen's principal.  Acess also says that Olsen is the only Access agent or employee with whom Tocco had contact.  Therefore,  Access argues that the release of Olsen acts to release it because Olsen's alleged promises are the only basis for Tocco's claims against it.

Tocco argues that Theophelis is inapplicable because her case against Access is not based solely on a theory of vicarious liability.  Tocco says Olsen was an Access employee, but that Access committed independent wrongful acts.  Tocco says her search for refinancing in 2003 began with a phone call to Access, and continued with Olsen.  Tocco says she and her husband eventually decided to refinance with Phillips.  Despite this, Tocco says Access remained involved in the refinancing because it received a $15,000.00 fee upon closing the mortgage with Argent.  Tocco says she remains uncertain of what role Access played in the refinancing, but its role is based on independent acts not attributable to Olsen.  She says that discovery will clarify Access' role in the 2003 refinancing.

13

Tocco also says that under M.C.L. § 600.2925d(a)[10], a release of one person only releases another person from liability for the same injury if the release's terms so provide, and her release of Olsen did not did not expressly release Access. Access responds that in Theophelis, the Michigan Supreme Court concluded that the intent of the Legislature was not to abrogate the common-law rule eliminating vicarious liability via a properly released agent.  430 Mich. at 485-491.

### b.  Resolution

Tocco has not alleged that any employee or agent from Access, other than Olsen, had any contact with her or Salvatore.  In fact, when asked at her deposition: "You don't believe you talked with anyone else other than Mike Olsen who was connected with Access?", Tocco answered, "That's what I thought."  Moreover, Olsen explained in his deposition testimony that the $15,000.00 fee paid to Access is an origination fee paid for his services (i.e. putting together and submitting to various lenders the Tocco's application) is unrefuted.  Simply concluding that because Access received a fee, someone at Access other than Olsen must have been involved in the refinancing, does not create a genuine issue of material fact.   Tocco also provides no basis for its assertion that Olsen was Access' employee, not its agent.  Tocco has not asserted liability against Access on a theory other than vicarious liability.  Therefore

---

[10]  M.C.L. § 600.2925d(a) provides that:
Sec. 2925d. If a release or a covenant not to sue or not to enforce judgment is given in good faith to 1 of 2 or more persons for the same injury or the same wrongful death, ... following appl[ies]:
    (a) The release or covenant does not discharge 1 or more of the other persons from liability for the injury or wrongful death unless its terms so provide.

Theophelis applies here to limit Access' liability.  Access' motion for summary judgment under the Release must be granted and all counts against it must be dismissed.

### 3. Counts 5 through 9[11]

### a.  Michigan Mortgage Brokers Act (Count 5) and Fraud (Count 6).

### i. The Legal Standard

Tocco's MMBA and Farud claims are based on her assertion that Access misrepresented the terms of the Argent mortgage and promised to refinance the mortgage after one year.

The MMBA prohibits licensed lenders from "engag[ing] in fraud, deceit, or material misrepresentation in connection with any transaction governed by this act" or otherwise fail to conduct business in accordance with the act.  M.C.L. § 445.1672.

To establish a cause of action for fraud or misrepresentation, a plaintiff must prove (1) that the charged party made a material representation; (2) that the representation was false; (3) that when he or she made the representation, he or she knew it was false, or made it recklessly, without any knowledge of its truth or falsity; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury. Eerdmans v. Maki, 226 Mich.App 360, 366 (1997); see also Scott v. Harper Recreation, Inc, 444 Mich. 441, 446 n 3 (1993).

### ii.  Arguments

Access says that even accepting Tocco's version of the facts, there are three

---

[11] The Release results in the dismissal of all claims against Access.  However, the Court will consider the remaining Counts against Access separately.

reasons why her claim should be dismissed.  First, Access says Tocco's claim is based on advice that refinancing was the best solution given the pressure upon her to payoff Nickola's lien.  Access says if made, these statements are merely opinions, and fraud cannot be predicated on opinion statements.  Windham v. Morris, 370 Mich. 188, 193 (1963).

Second, Access says the parol evidence rule bars Tocco's claims that she was promised a fixed rate mortgage without a prepayment penalty, as the promises run counter to plain, unambiguous, and conspicuous provisions in the documents Tocco signed at the closing.  The documents included a merger clause, meaning extrinsic evidence is inadmissible to contradict the language of the documents or to show false representations were made to induce a party to enter into the contract.  UAW-GM Human Res. Center v. KSL Recreation Corp., 228 Mich. App. 464 (1998).  Access says Tocco could not have been induced to believe and rely upon the promises she alleged were made to her regarding the terms of the loan and her ability to refinance in one year because because Tocco says that she and Salvatore questioned why the  documents included a variable interest rate and a penalty for paying off the mortgage early, but signed them anyways.

Finally, Access says that the Statute of Frauds precludes from consideration oral promises not reduced to writing involving a promise to lend money.  M.C.L. 566.132(2).  Therefore, Tocco's claim that she was promised that she could refinance in a year is cannot be considered.

Tocco responds that the Court should not dismiss her claim on the basis of any of Access' arguments because she has asserted that she was fraudulently induced into

16

signing the mortgage documents.  Fraudulent misrepresentations that induce a contract will void it, <u>Rood v. Midwest Matrix Mart, Inc.</u>, 350 Mich. 559 (1957), and extrinsic evidence can be considered to prove fraud.  Tocco says she was advised to disregard the written documents which were voluminous and confusing to her and, instead, to trust the oral promises made to her.  Tocco says she relied upon these promises because of her inexperience and belief that the defendants were acting in her best interest.  Tocco says that although Access' role in the refinancing is unclear, the fact that it received a $15,000.00 fee creates a genuine issue of fact as to its involvement in the misrepresentations and fraud.

### iii. Resolution

Tocco has failed to create a genuine issue of fact as to whether Access violated the MMBA or committed fraud because she makes no specific allegation that Access or Olsen made any promises to her regarding the terms of the mortgage or her ability to refinance in the future.  Instead, Tocco has repeatedly stated that Phillips made these promises, and that she believed that Access had no involvement with the refinancing once she was contacted by Philips.  Even though Access received $15,000.00 for "services" involving the refinancing, Tocco has not refuted Olsen's explanation that the fee was an "origination" fee paid for his services in putting together the Tocco's application and submitting it to Argent.  Likewise, Tocco has not asserted that Access was involved in developing the mortgage terms.  Tocco has presented no evidence to show that Access' receipt of the $15,000.00 fee was in exchange for any promises to the Toccos.  Therefore, Access' motion for summary judgement as to the MMBA and fraud claims must be granted.

17

### b.  The Truth in Lending Act/ Regulation Z (Count 7)

Count 7 is based on Tocco's assertion that she was never sent a good faith estimate (the estimate) containing the mortgage terms prior to the closing.  Tocco says that she and Salvatore signed the estimate at the closing and must have misdated it. Regulation Z of the TILA, 12 C.F.R. § 226.19(a)(1) requires that:

> In a residential mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601 et seq.) the creditor shall make good faith estimates of the disclosures required by § 226.18 before consummation, or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier.

Access admits that it did not supply the Tocco's with an estimate, but says that it is not liable under TILA because Argent is the creditor, and Argent sent the Toccos an estimate on August 7, 2003, which they signed the day before the closing.  Access says that there is no requirement that more than one party supply an estimate.

Access' motion for summary judgment must be granted as to this count because Access was the mortgage broker and Regulation Z clearly establishes that the creditor (i.e. the lender) is responsible for providing the estimate to the applicant.  Tocco has not asserted that Access played any role in developing the terms of the mortgage or has in any other manner acted as a creditor/ lender.

### c.  Unjust Enrichment (Count 8)

Tocco asserts that Access was unjustly enriched when it received $15.000.00 from the mortgage proceeds.  To establish a claim of unjust enrichment, a plaintiff must show "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity

18

resulting to plaintiff because of the retention of the benefit by defendant." <u>Belle Isle Grill Corp v. Detroit,</u> 256 Mich.App 463, 478 (2003). When these elements exist, "the law operates to imply a contract in order to prevent unjust enrichment ." <u>Barber v.. SMH (US), Inc</u>, 202 Mich.App 366, 375 (1994).

Access argues that Tocco's claim of unjust enrichment should be dismissed because unjust enrichment is available only where no express contract exists.  <u>Barber</u> 202 Mich. App. 366 at 375.  Access says the payment it received was covered by a contract–the closing documents.  Additionally, Access says an equitable remedy should not be imposed when Tocco seeks an inequitable remedy of relief from a large mortgage.

Tocco says her unjust enrichment claim should survives summary judgment because she is unaware of any contract between her and Access.  Tocco says discovery will reveal the terms and conditions of any alleged contract.  Tocco also says the contract, if it exists, is not determinative of this claim as it is unclear what Access did to justify receiving $15,000.

Access' motion for summary judgment must be granted as to this count.  Access explains that the $15,000.00 fee for Olsen's preparation and submission of their application to various lenders.  Tocco has failed to refute this explanation. Access explains that notice of the fee was included in the closing documents, which the Toccos signed.  The closing documents are an express contract.  Therefore, Tocco's claim of unjust enrichment is barred by <u>Barber.</u>

### d.  Equal Credit Opportunity Act (Count 9)

Tocco says she was discriminated against because of her age and/or gender in

the refinancing process.  The EEOC, 15 U.S.C. § 1691(a)(1), provides that:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--
>
> > (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).

Access says it should be granted summary judgment because it could not have discriminated against Tocco in her attempt to refinance because it was Argent, not Access that approved her mortgage.  Moreover, Access adds that Argent did not discriminate against Tocco because Salvatore was also presented with the same loan terms, and the loan documents were forms used with borrowers of both sexes and all ages.

Tocco says that her ECOA claim is based on the denial of her application to refinance the mortgage in 2004.  Tocco says in a conclusory manner that her complaint sufficiently put Access on notice as required under the federal rules.

Access' motion for summary judgment must be granted as to this count because Tocco has not alleged specific facts regarding how she was discriminated against by Access.  It was AMC, not Access, that declined her application for refinancing in 2004.

## C.  Argent, AMC, Phillips, and Deutsche's Motion for Summary Judgment

### 1.  Introduction

Argent, AMC, and Deutsche move for summary judgment on Counts 1 - 3 regarding the foreclosure proceedings; AMC moves for summary judgment on Count 4

for conduct relating to billing notices; and Argent, AMC, Phillips, and Deutsche argue that no genuine issue of material fact exists as to Counts 5 through 9 and Count 11, and asks that summary judgment be granted in their favor as to these counts.

## 2.   The Foreclosure Proceedings (Counts 1 though 3).

Tocco claims that Argent, AMC, and Deutsche violated the Michigan foreclosure notice statute (Count 1), the MCPA (Count 2), and the FDCPA (Count 3), by failing to specify at which courthouse the foreclosure of her home would occur.  Argent, AMC, and Deutsche say they complied with their statutory duties.

In her response to Argent, AMC, and Deutsche's motion for summary judgment, Tocco agreed to voluntarily dismiss Counts 1 through 3 because the claims became moot when Deutsche voluntarily dismissed the foreclosure action.  Tocco asks to reserve the right to reassert the claims should Deutsche again attempt to foreclose. Counts 1 through 3 are dismissed without prejudice.

## 3.   Fair Debt Collection Practices Act (Count 4)

Tocco claims that AMC violated the FDCPA when it failed to include certain disclosures in its notice informing Tocco that it would process all payments on the Argent mortgage.[12]

AMC argues that Tocco's complaint is defective because it does not state in how many notices it failed to include the disclosures.  Tocco responds that discovery will permit her to find out how many notices violated the FDCPA.

 Next, AMC argues it is not a "debt collector" under the statute.  AMC says it is

---

[12] Tocco does not specify what section of the FDCA she claims AMC violated.

21

not regulated by the FDCPA because a "debt collector" does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent that such activity...concerns debt <u>which was not in default at the time it was obtained by such person</u>."  15 U.S.C. § 1692a(6)(F)(iii) (emphasis added). AMC says it began servicing Tocco's mortgage debt shortly after closing and Tocco made the first 12 payments, meaning the debt was not in default at the time AMC began servicing the mortgage.  Tocco did not respond to this argument.

AMC's motion for summary judgment is granted as to this count because AMC's servicing of Tocco's mortgage with Argent is not regulated activity under the FDCPA. AMC is not a "debt collector" under the statute because the mortgage payments AMC collected were not in default at the time it began servicing the account.

### 4.  Michigan Mortgage Brokers Act (Counts 5) and Fraud (Count 6)

#### a.  Introduction

Tocco says that Philips violated the MMBA and committed fraud by promising Tocco and Salvatore that the mortgage would include a fixed interest rate, the loan would not include a prepayment penalty, and that they would be able to refinance at a lower rate after a year.  Tocco also names AMC in Counts 5 and 6.  Tocco's claim against AMC is premised on Tocco's assumption that AMC was formerly Ameriquest, which was Philips' employer during the relevant time period.  Therefore Tocco's claim against AMC is based on the theory of vicarious liability for Philips' actions.  As explained in footnote 2, the exact relationship between AMC and Ameriquest is unclear.

The legal standards under the MMBA and for  fraud are provided in section B(3)(a)(i).

22

### b. Arguments

AMC and Phillips argue that they should be granted summary judgment because Phillips did not make any of the alleged promises, and did not even contact Tocco until after the mortgage had closed. AMC and Philips point out that both Philips and Olsen stated in their sworn deposition testimony that they did not know one another prior to this case. Olsen says that he alone filed the application for the 2003 mortgage. Likewise, AMC and Phillips point out that all of the loan application documents list Olsen or Access as the loan originator and also show that it was Olsen who requested the 2003 appraisal by Mooney.

Next, AMC and Philips point to a letter written on November 27, 2004, from Tocco addressed to Tom Roberts, of the Office of the President of Ameriquest complaining about Phillips. Tocco writes,

> I had contacted my mortgage broker the latter part of August/September 2004 regarding refinancing my current mortgage in order to reduce my interest rate and monthly payments. I made monthly payments of $4,149.87 promptly and faithfully for almost a year to your company by myself (my husband passed away on 10-27-2003). Then all of a sudden in this same time period, I was contacted by phone by a Ryan Phillips (Sales, Portfolio retention) from Ameriquest Mortgage. He stated that he could refinance my current mortgage with a lower interest rate and lower montly payments without any problems , since I was already a customer, I agreed to this with my mortgage broker's approval because he though it would be faster and more convenient.

Tocco goes on to complain about the appraisal in which the house was valued at $500,000.00, and the subsequent denial of her application for refinancing based on this appraisal. Tocco states in the letter that she was "promised ... a new mortgage, lower interest rates, and lower monthly payments." AMC and Philips argue that this letter

23

supports their chronology of the events and indicates that the first time Phillips

contacted Tocco was after the 2003 mortgage had closed.

Tocco responds that there is evidence that Philips was involved in the refinancing

in 2003.  Tocco asserts that while conducting supplemental discovery, she found two

letters that substantiate her claim.  The first letter, dated September 2, 2003, is from

Tocco to "Ryan Phillips" and states: "Thank You For All Your Help.  I wanted to confirm

that payments will be made for one year out of the cash we received from the closing".

This letter is handwritten.  Tocco argues that this letter confirms that Phillips arranged

for the extra $50,000 to be included in the 2003 mortgage and confirms that these funds

were expected to be used to make a year's worth of payments.

The second letter, dated September 17, 2003, is from Olsen to the Toccos and

states: "I spoke with Mr. Phillips today and he told me that he referred you to Financial

Link Services to clear up several issues with regard to your credit report.  I will continue

working to close your loan as soon as possible."  Tocco argues that the second letter

confirms that Olsen and Phillips were working to repair her credit report problems and

were working on refinancing the loan as promised.

AMC and Phillips argue that Tocco created the handwritten September 2, 2003,

letter from Tocco to Phillips in response to the Court's observation that as of the motion

hearing on September 27, 2006, Tocco had produced no documentary evidence of

Phillips' involvement in the 2003 mortgage refinancing.  AMC and Phillips argue that the

September 17, 2003, letter is not evidence that Olsen and Phillips were working

together prior to the closing on August 29, 2003.  They explain that the "Mr. Phillips" that

Olsen is referring to in the letter is not Ryan Phillips, but Don Phillips, who was an

24

employee of Access.  Next, they point out that the letter was written after the August 29, 2003, closing and argues that this "completely undermines [Tocco's] assertion that she was promised a refinance of her loan in 2004, or that she was otherwise unaware of the terms of that loan ...  [and instead] is suggestive of [Tocco] seeking an immediate refinance of her Argent loans through Access."

Next, AMC and Phillips argue that even accepting Tocco's version of the facts, the Court should still dismiss Counts 5 and 6. First, AMC and Phillips rely on contract interpretation principles which typically honor the intent of the parties.  Under the common law, intent is discerned from the words used in the written document as long as the terms are plain, unambiguous, and subject to only one reasonable interpretation.  AMC and Phillips argue that the terms of the mortgage were plain and unambiguous to Tocco because she admits that she knew the mortgage included a variable interest rate and prepayment penalty before signing the documents.

Second, AMC and Phillips argue that the integration clause stating that the closing documents constitute the complete agreement of the parties is further evidence of the parties' intent.  AMC and Phillips assert that Tocco knew of the merger clause in the closing documents which she signed, and therefore it was unreasonable for her to rely on any prior statement not included in the agreement.

Regarding Phillips alleged promise that Tocco could refinance in one year,  AMC and Phillips argue that the parol evidence rule bars prior statements that contradict an unambiguous writing.  They point out that while "parol evidence is generally admissible to prove fraud, fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract."  KSL Recreation

25

Corp., 228 Mich. App. at 503.  Further, they argue that such future promises are not actionable because an action for fraud "must be predicated upon a statement relating to past or an existing fact," not future conduct.  Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330 (1976).

 Tocco responds that she disregarded the terms of the closing documents because she trusted that Phillips would deliver on his oral promises.  Therefore, Tocco asserts that she was fraudulently induced to sign the closing documents, and that the integration/merger clause cannot be used to preclude a fraud action.  Rood v. Midwest Matrix Mart, Inc., 350 Mich. 559 (1957).  Further Tocco argues that common law principles contract interpretation should not bar her claims because the intent of the parties in not plain from the closing documents.  Tocco says that the documents she signed were voluminous and confusing to her and Salvatore.  Tocco says she therefore relied upon Philips' promises because of her inexperience and belief that he was acting in her best interest.

### c. Resolution

Both Tocco and AMC and Phillips have provided sworn testimony and letters to support their account of the facts.   These accounts contradict one another, and would require the Court to weigh the validity of and draw conclusions about the evidence.  However, determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Whether Phillips was involved in the 2003 refinancing and made oral promises to Tocco are issues for the jury to decide.

Likewise, Tocco asserts fraud in the inducement, which permits consideration of

26

extrinsic evidence outside the closing statements.  Whether it was reasonable for her to

rely upon Phillips' alleged promises despite the contrary terms of the closing documents

is an issue for the jury to decide.  Accordingly AMC and Phillips' motion for summary

judgment as to Counts 5 and 6 must be denied.

### 5.  The Truth in Lending Act/ Regulation Z (Count 7)

#### a.  Arguments

Tocco claims that AMC, Phillips, and Argent failed to provide her with a good

faith estimate prior to closing, as required by 12 C.F.R. § 226.19(a)(1).

AMC, Phillips, and Argent say that Argent mailed a good faith estimate to the

Tocco's on August 11, 2003, more than two weeks before the closing.  They assert that

the estimate reflects that Toccos signed it on August 28, 2003, a day before the closing;

therefore, no cause of action under the TILA exists.

Tocco responds in her affidavit and her deposition testimony that she and

Salvatore must have mistakenly dated the estimate for August 28, 2003, because they

did not receive the estimate until the closing.  Tocco points out that the defendants have

produced no evidence of mailing the estimate to her or Salvatore.  Tocco argues that

the differing versions of the events creates a genuine issue of material fact.  Tocco says

that AMC -- the mortgage broker,  Phillips -- AMC's employee, and Argent -- the lender,

all contributed to the terms in the estimate.

#### b. Resolution

AMC and Phillips motion for summary judgment as to this count must be granted

because as discussed in section B(3)(b), the TILA/ Regulation Z clearly establishes that

the <u>creditor</u>  (i.e. the lender) is responsible for providing the estimate to the applicant.

27

Argent was the lender here, not AMC.   Although Tocco asserts Phillips made her promises regarding the mortgage terms that contradicted the terms in the closing documents, these allegations concern whether fraud in the inducement occurred, and are distinct from whether Phillips or AMC had a duty to provide her with a good faith estimate.

On the other hand, Argent's motion for summary judgement as to this count must be denied, because it was the lender.  In light of the fact that Argent has not provided documentation showing that it mailed the estimate, Tocco's desposition testimony that she never received a estimate before the closing create a genuine issue of fact for the jury to determine.

### 6.   Unjust Enrichment (Count 8)

#### a.  Arguments

Tocco claims that Argent and AMC were unjustly enriched by income earned through the mortgage due to the terms being different than the terms she was promised. Moreover, Tocco says that Argent and AMC  knew that she would not be able to make the mortgage payments after the first 12 months; she would not qualify for refinancing; and, they ensured she would not qualify for refinancing by obtaining a significantly reduced appraisal on her home.  Therefore they will be enriched through the foreclosure of the house.  As discussed in section B(3)(c), unjust enrichment requires a showing that (a) the defendant received a benefit, and (b) an inequity will result because of the defendants' retention of the benefit.

Argent and AMC argue that unjust enrichment is an equitable remedy to imply a contract where none exists.  See Barber, 202 Mich. App at 375.  Accordingly, unjust

28

enrichment cannot be implied where a written agreement, here the closing documents, governs the parties' transaction. Tocco responds that there is no valid written agreement in this case because she was fraudulently induced to sign the closing documents.

### b. Resolution

Argent and AMC's motion for summary judgment as to this Count must be granted. Tocco cites no case law for the proposition that fraud in the inducement can negate a written contract (i.e. the closing documents), thus giving rise to an implied contract under unjust enrichment. The mortgage and surrounding circumstances give rise to potential liability for fraud, which Tocco asserts in counts 5 and 6 against AMC and Phillips.

### 7. Michigan Consumer Protection Act (Count 11)

### a. Arguments

Tocco makes a general allegation that the cumulative acts of Argent, AMC, Phillips, and Deutsche violated the MCPA. The defendants argue that their motion for summary judgment as to this count should be granted because "transactions or conduct specifically authorized under the laws administered by a regulatory board or officer acting under statutory authority of this state or the United States" are specifically exempted under the MCPA. M.C.L. § 445.904(1)(a). The defendants say that residential mortgage loan transactions offered by banks fall within this exemption, Newton v. Bank West, 262 Mich. App. 434, 438 (2004). By extension, registered mortgage lenders are also exempt. Inge v. Rock Financial Corp., 2004 Mich. App. LEXIS 2107 (August 10, 2004).

29

Tocco responds that the broad rule asserted by the defendants do not apply where the acts complained of are fraudulent in nature, and granting the motion would mean the MCPA does not protect consumers in loan transactions.  Tocco argues that Newton and Inge are distinguishable from this case because they involve lenders charging a documentation fee -- a transaction exempt from the MCPA because it was specifically authorized under regulatory statutes.  In contrast,  this case involves fraudulent actions that induced Tocco to enter into the agreement in the first place.  Tocco says the discrepancies between the oral promises and the documents presented at closing are a clear violate of the  MCPA.  See e.g. Evans v. Ameriquest Mortgage Co., 2003 Mich. App. LEXIS 564 (March 4, 2003).

Argent also argues in a supplemental letter to the Court that it owes no duty of care to Tocco with respect to approving the Tocco's application to refinance.  Argent says that In Ulrich v. Federal Land Bank,192 Mich, App. 194, 196 (1991), the Michigan Court of Appeals rejected a claim that a defendant lender had negligently loaned money to the plaintiffs.  Like Tocco, the plaintiffs claimed that they were inexperienced in financial transactions and relied on the lender to throughly research their ability to pay the loan.  The court determined that the lender "had no independent legal duty to exercise reasonable care in determining [the] plaintiff's eligibility for a loan." Id.  at 200.  Therefore, the court declined to find a fiduciary relationship or "create what is essentially a backdoor defense to the enforcement of [the plaintiff's contractual' obligations by allowing [the] plaintiffs to later claim that [the lender] acted negligently in allowing them to enter into the contact in the first place.  Id. at 199-200.

Tocco did not respond to Argent's supplemental letter.

30

### b.  Resolution

Argent and Deutshe's motion for summary judgment as to this count must be granted.  Although the claim encompasses the "cumulative" acts of the defendants, Tocco makes no allegation that Argent or Deutsche participated in making fraudulent promises or otherwise induced Tocco's belief as to the terms of the mortgage.  Instead, Tocco claims that she only communicated with Phillips.[13]

The factual difference between <u>Newton</u> and <u>Inge</u> compared with the facts in this case suggests a different result as to AMC and Phillips.  Inducing a person to enter into a mortgage with oral promises is not similar to charging of a fee.  The MCPA prohibits fraud, and therefore,  AMC and Phillips are not exempt from the MCPA.  However, Tocco's claim is duplicative as she has already claimed violation of the MMBA (Count 5) and fraud (Count 6) which encompass the allegation in this count.  Accordingly, AMC and Phillips motion for summary judgment is granted as to this count.

### 8.  Equal Credit Opportunity Act (Count 9)

### a.  Arguments

Tocco claims that Argent, AMC, Phillips, and Deutsche discriminated against her on the basis of age and/or gender in her attempts to refinance the mortgage in 2004. The defendants argue that summary judgment should be granted as to this count because Tocco has failed to provid any factual basis for the claim beyond her belief. AMC maintains that Tocco's application for refinancing in 2004 was denied because the of the lower appraisal value of her home.  Tocco responds that summary judgment should be denied because the federal rules only require a short and plain statement of

---

[13]  The Court did not evaluate <u>Ulrich</u> in reaching its decision.

the claim, which she says she made.

### b.  Resolution

The defendants' motion for summary judgment must be granted.  Tocco simply does not explain how she was discriminated against on the basis of age or gender, and she has failed to refute AMC's explanation that her application for refinancing was denied because of the lower appraisal value of her home.

## D. White's Motion for Summary Judgment

### 1. Introduction

White is charged with malpractice in Count 10.  He moved for summary judgment on the basis that the claim is barred by the statute of limitations.  White also moves for summary judgment as to the alleged violation of the ECOA (Count 9), and MCPA (Count 11), on the basis that they have no merit.

### 2. Legal Malpractice for Failure to Protect (Count 10)

### a.  The Legal Standard

In <u>Coleman v. Gurwin</u>, 443 Mich. 59, 63(1993), the Michigan Supreme Court unanimously held that the elements of a legal malpractice action in Michigan are as follows:

(1) the existence of an attorney-client relationship;
(2) negligence in the legal representation of the plaintiff;
(3) that the negligence was a proximate cause of an injury; and
(4) the fact and extent of the injury alleged.

### b.  Arguments

Tocco's malpractice claim is based on White's alleged failure to protect her and Salvatore in the 2003 refinancing.  Tocco says that White had a duty to advise her that

32

there was no guarantee that any of the defendants would refinance mortgage after one

year, and that the transaction would likely result in a foreclosure.

Tocco relies on paragraphs one and two of the Attorney Fee Arrangement

between her and White to support her argument that White agreed to represent her and

Salvatore's interests in the refinancing.  These paragraphs state that:

> (1)  Client desires Attorney to mediate all disputes with David Nickola
> regarding the [subject] property.

> (2)  Attorney will provide assistance and consultation in obtaining the
> following:
>> A. A settlement agreement with David Nickola releasing the lien.
>> B. Refinancing on the above-referenced property.

Tocco says that White did not earn the $5,000.00 fee he received out of the mortgage

transaction because he worked for less than three hours on their case; he failed to ever

meet with her or Salvatore personally to discuss the refinancing, and he never reviewed

any of the closing documents.  Tocco says that summary judgment as to Count 10 is

inappropriate because  there are questions of material fact as to the purpose for which

she hired White, and the nature of his duties.

White asserts that the claim of malpractice is meritless because he never agreed

to represent Tocco or Salvatore at the closing.  White argues that the terms of their fee

arrangement clearly reflect that White's duties were limited to trying to convince Nickola

to delay foreclosure while the Toccos attempted to refinance their home and get  money

to pay off the lien.  White says that he referred the Toccos to Olsen and this was the full

extent of his involvement in the refinancing.  White also says that the Toccos could not

have expected him to represent them in the closing because they did not ask him to

attend the closing, and were surprised to see him there.   White points out that  Tocco

33

testified at her deposition that she didn't recall any discussion with White regarding the refinancing and that "Mr. Olsen took care of everything."  Tocco also testified that White never talked to them at the closing.  In fact, Tocco testified that:

> Well, Mr. White just sat there.  I don't know if he looked over any of this paperwork.  He didn't say boo to me.  And that's the first time I ever saw him and he just sat way back there. I was wonder why he didn't come to the table and kind of look through the paperwork.  And that bothered me.

Tocco also could not recall if she or Salvatore specifically asked White about the terms of the mortgage.

Alternatively, White argues that Count 10 should be dismissed as a matter of law because a malpractice claim must be filed within two years of the date of last service for the matters giving rise to the claim, M.C.L. § 600. 5838(1), or within six months after the client discovers or should have discovered the claim.  M.C.L. § 600. 5838(2)[14].  White

---

[14]  M.C.L. § 5838(1) provides:

 Except as otherwise provided in section 5838a, a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

 M.C.L. § 5838((2) provides:

 Except as otherwise provided in section 5838a, an action involving a claim based on malpractice may be commenced at any time within the applicable period prescribed in sections 5805 [FN2] or 5851 to 5856, [FN3] or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later. The burden of proving that the plaintiff neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff. A malpractice action which is not commenced within the time prescribed by this subsection is barred.

points out that in the legal malpractice context, "[a]" lawyer discontinues serving a client when relieved of the obligation by the client or the court, ... or upon completion of a specific legal service that the lawyer was retained to perform." Chapman v. Sullivan, 161 Mich. App. 558 (1987).  The "last serving" which is controlling for purposes of the operation of the statute of limitations is the discontinuance of service "as to the matters out of which the claim for malpractice arose." Id.  White says he discontinued serving Tocco with respect to the August 29, 2003 refinance transaction on the day of closing which is more than two years before the filing of Tocco's first amended complaint on December 9, 2005.  White points out that Tocco testified at her deposition that she did not speak with White any further after the day of the closing to discuss "whether or not [she and her husband] were going to be able to make payment on [the mortgage]."

Tocco argues that she did file the claim within two years of the date of White's last service because she had continuing contacts with White regarding a number of legal matters up to at least February, 2004.  Tocco relies on RLVIS Inc., v, Dawda, No. 265167 Mich. App. LEXIS 605 (2006), in which the Michigan Court of Appeals clarified when legal representation ends for the purpose of applying the two year statue of limitations.  The court stated:

> The 'last treatment rule' as codified in MCL 600.5838(1), provides that the two-year statute of limitations governing legal malpractice claims does not begin to run when the professional has ceased to provide services with regard to a single matter; rather, the statue of limitations begins to run only when the professional has ceased providing services as to the broad 'matter' out of which the claim arises.

Id. at *5.  Tocco asserts that White continued to represent her in the refinancing matter

35

until February, 2004, and points out that White says in his deposition testimony that he did receive phone messages and talked to Tocco about many different matters after the closing date.

White responds that Tocco's correspondence with White beyond the closing date does not extend the accrual date because on the occasions that he did speak to Tocco, they did not discuss matters related to the refinancing.  Moreover, White insists that Tocco only attempt to talk to him about her efforts to refinance were on February 8, 2004, when she sent him a fax about her credit rating.  White says that he never responded to the fax.  White argues that this fax does not extend the accrual date becuase a "[a] unilateral act is not sufficient to create an attorney-client relationship, the attorney-client relationship is based in contract."  Scott v. Green, 140 Mich. App. 384, 400 (1985)(concurrence of Kirwan, J.).  See also Jackson v. Pollack, 941 F.3d 1209 (6th Cir. 1991)("Michigan law provides that a putative client's subjective belief is by itself insufficient to establish an attorney-client relationship.")[15]

### b. Resolution

Whether Tocco has established a genuine issue of fact as to the scope of White's duties under the Fee Arrangement is immaterial.  Even if Tocco could establish that White is liable for not representing her interests at the closing, any duty White owed Tocco ended on August 29, 2003, and Tocco failed to bring her malpractice claim within two years of that date.

Tocco has also failed to establish that the date of accrual date should be

---

[15] The Court need not discuss White's argument that the six month discovery rule also does not apply in this case because Tocco agrees that it does not apply.

extended.  Although Tocco asserts that her conversations with White after the closing

were related to the 2003 refinancing, Tocco specifically testified at deposition that she

did not discuss the terms of the 2003 mortgage with White after the closing.   Therefore,

White's motion for summary judgment as to Count 10 must be granted.

### 3. Michigan Consumer Protection Act (Count 11)

### a.  Arguments

Tocco claims that White's actions (failure to protect) also violated the MCPA

because White acted not only as an attorney, but also as a mortgage broker through the

refinancing.  In particular, Tocco asserts White acted as a mortgage broker because the

Fee Arrangement shows that White was hired to aid in the refinancing; he appeared at

the closing; and he collected a  $5,000.00 fee for arranging the refinancing of her home

through the refinance proceeds.  Tocco also points out that White admits that he has

offered assistance in refinancing to other customers.   Tocco argues that these actions,

taken together indicate that White was acting as a mortgage broker.  Since White is not

a licensed broker his actions are actionable under the MCPA.

White argues that liability under the MCPA is limited to conduct related to

"entrepreneurial, commercial or business" aspects of the profession.  White points out

that Tocco's alleged violations of the MCPA relate purely to Mr. White's rendering of

legal services as set forth in Count 10.   Therefore, Count 11 should be dismissed as a

matter of law.  See Comer v. Thomas and Jensen, P.C. 1997 Mich. App. LEXIS 2949

(Mich. Ct. App. Apr. 25, 1997) (dismissing the claim of the plaintiff who was sued

attorney under MCPA for mishandling tax case, and related IRS filings upon finding that

the claim related to the attorney's performance of legal services, and was not related to

entrepreneurial, commercial or business aspects of the attorney's law practice.)
White also points out that the Toccos signed a "Release of Proceeds" stating that his
$5,000.00 fee was being paid out of the refinancing "for legal and mediation services
associated with the refinancing."

White also argues that Tocco never considered him to be her mortgage broker.
White points out that when Tocco was asked at her deposition, "And so Olsen is the one
that you put in charge of finding you a loan?",  Tocco answered, "I guess so.  That's
how it ended up."  Likewise, when asked whether she recalled  any discussion
regarding the refinancing of the property with White, Tocco responded that "I think Mr.
Olsen took care of everything."   Tocco similarly recalled that during the refinancing
process, "Mr. Olsen was always there for all my questions" while, "Mr. White was like a
very faint image."

### b. Resolution

White's motion for summary judgment as to Count 11 must be granted.  Tocco
has failed to raise a genuine issue of fact as to whether she hired or considered White
to be her mortgage broker.  As Tocco repeatedly stated throughout her deposition, she
only spoke to Olsen and Phillips regarding the refinancing and terms of the 2003
mortgage.

### 4.  Equal Credit Opportunity Act (Count 9)

White's motion for summary judgment as to Count 9 must be granted.  Tocco has
not provided any factual basis for the allegation that she was discriminated against on
the basis of her age or gender in the refinancing process.   Moreover, Tocco has failed

to establish that White was in any way involved in her attempt to refinance in 2004.

### E.  Tocco's Motion for Leave to File Second Amended Complaint

#### a.  Argument

On July 27, 2006, Plaintiff Tocco filed a motion for leave to file second amended complaint. Tocco moves  to add White as a defendant in Counts 5-8 of the First Amended Complaint.  Tocco says that the basis for adding these claims against White stem from evidence gathered during discovery, namely the Attorney Fee Arrangement and White's deposition testimony.  Tocco says that  "[b]ased upon the aforestated discovery, it has become apparent that in addition to the duties as counsel for the Plaintiff, White also owed duties to the Plaintiff in the capacity of a mortgage broker... and that White breached certain duties to the Plaintiff in the capacity as a mortgage broker."

#### b. Resolution

Tocco's motion to add White to the MMBA claim (Count 5) on grounds that he acted as a mortgage broker is denied.  Tocco essentially recounts the arguments set forth in her claim that White violated the MCPA (Count 11), and the Court has already determined that Tocco has failed to create a genuine issue of fact as to whether White acted as a mortgage broker.

Tocco's motion to add White to the claim of misrepresentation and fraud (Count 6) is denied.  Tocco has never alleged that White made any misrepresentations to her regarding the terms of the 2003 mortgage or her ability to refinance in 2004.  In fact, her malpractice claim in Count 10 is based on the opposite assertion–that White failed altogether to give her any advice concerning the terms of the mortgage.

39

Tocco's motion to add White to the claim of a violation of TILA/ Regulation Z (Count 7) is denied. White is not a creditor, and therefore had no duty to provide Tocco with a good faith estimate.

Finally, Tocco's motion to add White to the claim of unjust enrichment (Count 8) is denied. Unjust enrichment is available only where no express contract exists. Barber, 202 Mich. App. 366 at 375. White was paid out of the proceeds of the transaction pursuant to the mortgage contract.

## IV. CONCLUSION

For the above stated reasons, the case will proceed as follows, with all other counts and parties dismissed from the case:

Count 5 against AMC and Phillips for violation of the MMBA;

Count 6 against AMC and Phillips for fraud; and

Count 7 against Argent for violation of the TILA/Regulation Z.

Insofar as Tocco can prove these claims against AMC, Phillips, and Argent to a jury, she is limited to actual and punitive damages, if applicable.

Dated: January 18, 2007                    s/Avern Cohn
                                           AVERN COHN
                                           UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 18, 2007, by electronic and/or ordinary mail.

                                           s/Julie Owens
                                           Case Manager, (313) 234-5160

40